IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JOHN INGERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:18-CV-227-Z-BR |
| | § | |
| PRINCIPAL LIFE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## TO ENTER JUDGMENT ON THE RECORD FOR DEFENDANT

Plaintiff John Ingerson ("Ingerson") brought this suit against Defendant Principal Life Insurance Company ("Principal") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), alleging that Principal abused its discretion in denying his claims for long-term disability ("LTD") benefits under the Group Long Term Disability Insurance Policy No. GLT 1040259 (the "policy") sponsored by Scottco Mechanical Contractors, Inc. ("Scottco"), Ingerson's former employer.[1] (*See* ECF 19 at 1, 8). Specifically, Ingerson claims Principal abused its discretion in finding he did not meet the policy's definition of "disability." (*See id*. at 1).

The parties requested this case be tried on the administrative record and briefing. (*See* ECF 11, 11-1). The undersigned granted the parties' request and issued the Scheduling Order (ECF 14) to facilitate trial of the case on the administrative record and briefing. Pursuant to the Scheduling

---

[1] The policy is governed by ERISA. Section 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The parties do not dispute that Ingerson is entitled to bring this suit under ERISA.

Order, the parties filed the administrative record (ECF 15) and cross motions for judgment on the record.[2] The following are before the Court: Defendant's Opening Brief on the Merits (ECF 18); Plaintiff's Brief (ECF 19); Defendant's Response to Plaintiff's Brief (ECF 20); Plaintiff's Brief in Response to Defendant's Opening Brief on the Merits (ECF 21); Defendant's Reply in Support of its Opening Brief on the Merits (ECF 23); and Plaintiff's Reply Brief to Defendant's Response to Plaintiff's Brief (ECF 24). Having considered the motions, responses, replies, the administrative record, and the applicable law, the undersigned makes the below recommended findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52[3] and recommends the District Judge enter judgment on the record in favor of Principal.

## I.  RECOMMENDED FINDINGS OF FACT

According to the administrative record, Ingerson has a "chronic history of narcolepsy with reported fatigue and excessive daytime sleepiness." (ECF 15-7 at 11). Ingerson worked for Scottco as a sales manager beginning in February 2012 (*see id*. at 312) and obtained coverage under Scottco's policy through his employment (ECF 15-1 at 15, 33; 15-10 at 369). Pursuant to the policy, the following definitions and requirements must be satisfied to receive LTD benefits:

**Disability; Disabled**

A Member will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy:

---

[2] Citations to the administrative record will refer to the numbering assigned by the Court's filing system.

[3] Federal Rule of Civil Procedure 52 governs actions "tried on the facts without a jury." *See* Fed. R. Civ. P. 52. Under Rule 52, a court essentially conducts a bench trial on the record. *See Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1071 (E.D. Tex. 2019). Federal Rule of Civil Procedure 52 governs this action because the parties elected to have this action tried by the Court on the administrative record. (*See* ECF 12, 17). Rule 52 requires a court to "find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a). "Rule 52(a) does not require that the district court set out findings on all factual questions that arise in a case." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997). "Rule 52(a) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (internal quotation omitted). "The rule is satisfied if the district court's findings give the reviewing court a clear understanding of the basis for the decision." *Id*.

During the Elimination Period and the Own Occupation Period, one of the following applies:

> a. The Member cannot perform the majority of the Substantial and Material Duties of his or her Own Occupation.

> b. The Member is performing the duties of his or her Own Occupation on a Modified Basis or any occupation and is unable to earn more than 80% of his or her Indexed Predisability Earnings.

After completing the Elimination Period and the Own Occupation Period, one of the following applies:

> a. The Member cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience.

> b. The Member is performing the Substantial and Material Duties of his or her Own Occupation or any occupation on a Modified Basis and is unable to earn more than 60% of his or her Indexed Predisability Earnings.

The loss of a professional or occupational license or certification does not, in itself, constitute a Disability.

***

**Own Occupation**

The occupation the Member is routinely performing when Disability begins. The occupation of the Member as it is performed in the national economy when Disability begins. Own Occupation does not mean the specific tasks or job the Member is performing for the Policyholder or at a specific location.

***

**Article 3 - Proof of Disability**

Written proof that Disability exists and has been continuous must be sent to The Principal within six months after the date a Member completes an Elimination Period. Proof required includes the date, nature, and extent of loss. Further proof that Disability has not ended must be sent when requested by The Principal. The Principal may request additional information to substantiate loss or require a Signed unaltered authorization to obtain that information from the provider. The Principal reserves the right to determine when these conditions are met. Failure to comply with the request of The Principal could result in declination of the claim. For purposes of satisfying the claims processing timing requirements of the Employee Retirement Income Security Act (ERISA), receipt of claim will be considered to be met when the Elimination Period has been completed and the appropriate claim form is received by The Principal.

(ECF 15-1 at 12–13, 19, 55). The Elimination Period is 90 days, and the Own Occupation Period is two years. (*Id*. at 10).

## Ingerson Sought and Received Short-Term Disability Benefits Under the Policy

On March 13, 2015, Principal terminated Ingerson's employment. (ECF 15-4 at 46). On March 23, 2015, a claim form for short-term disability benefits was submitted on Ingerson's behalf. (*See* ECF 15-10 at 259–264). Ingerson submitted an employee statement in support of his claim, which listed narcolepsy and "sleep disorder" as the bases for his disability and March 13, 2015, Ingerson's date of termination, as the date of occurrence. (*See id*. at 254). He also submitted an attending physician statement completed by Dr. Eric Ehle ("Dr. Ehle"), a family medicine doctor, that indicated a diagnosis of narcolepsy, difficulty staying awake, and extreme daytime fatigue. (*See id*. at 252–53). Ingerson was given an "Incurred Date" of March 14, 2015. (*See* ECF 15-4 at 1). Principal approved Ingerson for short-term disability benefits effective March 14, 2015 through June 12, 2015 based on Ingerson's inability to perform his job and the documents he provided. (*See* ECF 15-10 at 235–36, 251–56).

## Principal Denied Ingerson Further Benefits Due to Lack of Medical Records

On May 7, 2015, Jeremiah Saiz ("Saiz"), a Scottco human resources employee, informed Principal that Ingerson was terminated because of "performance issues." (ECF 15-4 at 52). As a result, Principal sent Ingerson a letter on May 14, 2015 requesting medical records from Dr. Ehle to support Ingerson's claim of disability and inability to perform his job. (ECF 15-10 at 31–32). The letter set a deadline of May 22, 2015 for Ingerson to provide the requested medical records. (*Id*. at 31). Ingerson failed to provide Principal with the requested medical records. On May 28, 2015, Principal notified Ingerson it was denying any further short-term disability benefits and LTD benefits based on insufficient documentation supporting his alleged disability, as well as Dr. Ehle's

4

opinion that he could return to work for "any and all" hours. (*See id*. at 14–17). The letter also notified Ingerson of his right to appeal Principal's denial of benefits and the requirements for such an appeal. (*Id*. at 15–16).

**Ingerson's Appeal of Principal's Denial of Short-Term and LTD Benefits Under the Policy**

On August 25, 2015, Ingerson's counsel at the time, Lewis Coppedge ("Coppedge"), notified Principal by letter that Ingerson planned to appeal Principal's denial of benefits. (*See id*. at 1). In response, on August 28, 2015, Principal notified Coppedge the letter was insufficient to constitute an appeal because the letter did not comply with the May 28, 2015 denial letter's requirements for an appeal. (*See* ECF 15-9 at 234).

Nevertheless, by letter dated September 4, 2015, Coppedge sent Principal a letter stating he represented Ingerson in his appeal, and that although Ingerson may submit "even more information" in support of his appeal, the enclosed communication from Principal to Ingerson clearly establishes Ingerson's right to benefits. (*See id*. at 227–28). The enclosed communication was a copy of a May 29, 2015 letter Saiz sent to Ingerson that stated "[u]pon making reasonable accommodations for you to perform your essential Job functions as Sales Manager, [Scottco] determined that you were unable to satisfactorily perform the essential functions of your position due to health related issues." (*Id*. at 228). Coppedge's September 4, 2015 letter requested Principal reconsider its denial of benefits and reinstate Ingerson's short-term and LTD benefits immediately based on Saiz's May 29, 2015 letter. (*See id*. at 227).

On September 8, 2015, Coppedge sent Principal another letter asking Principal to consider his previous letters an appeal of Principal's denial of short-term and LTD benefits. (*See id*. at 207). The letter stated Ingerson would provide more information soon, but that the information already submitted was sufficient to resolve the appeal. (*See id*.). Coppedge's letter asked Principal to

"remit payment for [Ingerson's] Claims to [him] immediately, plus [Ingerson's] attorneys' [fees] which now total $2,300." (*See id.*). On October 20, 2015, Coppedge sent Principal a letter and enclosures again asking Principal to consider his previous letters an appeal and reinstate Ingerson's short-term and LTD benefits. (*See id.* at 198–200). Enclosed was a letter from Dr. Ehle stating he and Ingerson were working to treat Ingerson's narcolepsy, which significantly impaired Ingerson's ability to function, and that he had not seen a significant worsening of Ingerson's narcolepsy over the past year. (*See id.* at 199). Principal's October 26, 2015 claim notes stated Ingerson's request for an appeal would be referred to the appeal team for handling. (*See* ECF 15-4 at 59).

### Principal Obtained Additional Information Regarding Ingerson's Termination and a Peer Review Report

By email dated October 29, 2015, Principal asked Saiz to explain how Ingerson was unable to perform the essential functions of his "job/occupation" due to his health issues. (*See* ECF 15-9 at 185). By letter dated October 29, 2015, Principal acknowledged receipt of Ingerson's appeal. (*See id.* at 186–87). Principal's letter reiterated its request previously stated in its original denial letter (*see* ECF 15-10 at 15–16) that Ingerson submit evidence of specific restrictions and limitations from a board-certified specialist, such as a Sleep Medicine Specialist, along with documentation supporting any functional limitations (*see* ECF 15-9 at 186). By letter dated November 4, 2015, Coppedge reported Ingerson had not seen a sleep specialist in several years. (*See id.* at 159–62). Coppedge submitted letters dated 2007 and 2008 from Dr. Gary Polk ("Dr. Polk"), a pulmonologist. (*See id.* at 160–61). Dr. Polk's letters stated Ingerson has a history of narcolepsy, but noted that no sleep-testing had been performed since 1999. (*See id.*).

On December 4, 2015, Saiz submitted a letter in response to Principal's request for an explanation as to how Ingerson's health issues prevented him from performing his sales manager job. (*See id.* at 129, 132). The letter stated:

> John Ingerson came forward with needing an accommodation for his physical condition to his direct supervisor, David Brewer at the beginning of July 2014. He was allowed to work from home on one day a week around July 16, 2014 with the understanding that he would be present for any necessary meetings. He was also given longer lunch breaks, as well as breaks throughout the day to accommodate his need for rest. This went on for the remainder of his time with Scottco. While at work, Mr. Ingerson did the very best he could, even though it was clearly apparent that his health was lessening. As a Sales Manager, Mr. Ingerson had expectations, goals and responsibilities that because of his health issues, were not being met. At that point, Mr. Ingerson's direct supervisor decided that it would be more beneficial for Mr. Ingerson's health, as well as with Scottco, that both parties end the employment relationship.

(*Id*. at 132). Principal referred Ingerson's claim for a peer review with an internal medicine provider specializing in either pulmonary disease or narcolepsy. (*See* ECF 15-4 at 63–64; *see* 15-9 at 19–22). Dr. Akshay Sood ("Dr. Sood"), who specializes in pulmonary medicine and occupational medicine, issued a report on February 4, 2016 detailing his findings from his review of Ingerson's claim. (ECF 15-8 at 70–76). Dr. Sood's report stated "the primary condition affecting [Ingerson's] functionality is narcolepsy." (*Id*. at 72). Dr. Sood's report further stated:

> Based on the medical records for review, the claimant is capable of performing his light job from May 1, 2015, through June 12, 2015, on a full-time basis with the below mentioned restrictions and/or limitations. In addition, the claimant is capable of and had the ability to do his own occupation which is sedentary from June 13, 2015, to current on a full-time basis with the below mentioned restrictions and/or limitations. The medical records do not prevent the claimant from performing any occupation on a part-time basis with the below mentioned restrictions and/or limitations.
>
> The claimant can work eight hours a day five days a week for a total of 40 hours per week.
> The claimant can work one day a week from home.
> The claimant can sit, stand, and walk without restrictions.
> The claimant can lift/carry/push/pull 0 to 10 pounds constantly, 11 to 20 pounds frequently and 21 to 50 pounds occasionally with bilateral upper extremities.
> The claimant can reach in all extremities without restrictions with bilateral upper extremities.
> The claimant can perform hand and finger manipulation including feeling, typing/keyboarding, pinching, gripping, and simple and firm grasping without restrictions with bilateral upper extremities.
> The claimant can bend and twist at the waist, climb, balance, squat, stoop, crouch,

crawl, and kneel and use bilateral foot controls without restrictions.
The claimant needs an extended lunch for two hours daily to allow him to take a nap as necessary.
The claimant can arrive one hour late to work, as needed.
The claimant can take an additional 15-minute break for every four hours of work to take a short nap.

(*Id*. at 74–75).

## Principal Reinstated Ingerson's Benefits

After reviewing the additional documents Coppedge submitted, Saiz's explanation of Ingerson's termination, and Dr. Sood's report, Principal notified Coppedge by letter dated February 29, 2016 that it had reconsidered Ingerson's claims for short-term and LTD benefits and determined that Ingerson was eligible for such benefits. (*See id*. at 39–44). The letter stated:

Periodically, we will be requesting updated information from Mr. Ingerson and/or his treatment providers to evaluate his continued eligibility for benefits. During the first 24 Months of benefits, through June 12, 2017, Mr. Ingerson must be unable to perform the majority of the Substantial and Material Duties of his Own Occupation. To be eligible for benefits beyond the first 24 Months, or June 12, 2017, he must be unable at that time and due solely to his medical condition(s) to work at any occupation.

(*Id*. at 39).

On April 1, 2016, Saiz responded to Principal's request for more information regarding Ingerson's job duties and termination. (*See id*. at 8–11). Saiz informed Principal "Ingerson's termination was based on the decline of his personal health which led to him missing [too much] work for him to be able to run a successful department." (*See id*. at 11). Saiz further reported he was not aware of any customer complaints regarding Ingerson, that Ingerson had a flexible schedule that allowed him to work from home and take extended breaks throughout the day, and that, at the time Scottco re-hired him in 2012, Ingerson was coming off of disability for the same health-related issues. (*See id*.).

**Investigative Interview of Ingerson**

As part of Principal's continued evaluation of Ingerson's entitlement to benefits, an investigator from a third-party vendor, CoventBridge (USA) Inc. ("CoventBridge"), interviewed Ingerson on June 27, 2016 at his house for approximately two hours. (*See* ECF 15-7 at 316; *see also* 20 at 16, n.51). The investigator reported Ingerson sat in an office chair during the two-hour interview and maintained concentration and focus. (ECF 15-7 at 307). The investigator's report detailing the interview stated:

— Ingerson was disabled from 2007 through 2012.

— Ingerson worked for Scottco from February 2012 to March 2015 as a sales manager. He was required to meet with clients in the field, and Scottco provided some accommodations towards the end of his employment. For example, if he had to visit off-site locations, an associate would chauffeur him.

— He supervised a team of three salesmen, who worked in the field selling Scottco services to residential and commercial individuals in the Amarillo area.

— Ingerson worked five days a week, usually from 8:00 a.m. to 5:00 p.m. His schedule was modified to allow for Wednesdays off, so he could catch up on sleep. This modification did not work well because he was needed at the office to run his sales team.

— On average, Ingerson spent his workday as follows: 60 percent talking, 10 percent walking, 10 percent sitting, and 20 percent standing.

— Ingerson's day began with a manager's meeting at 8:15 a.m., which lasted approximately 30 minutes. From approximately 9:30 a.m. or 10:00 a.m. he addressed customer needs until 12:00 p.m., then took a lunch break until approximately 1:30 p.m. He napped during this time. From 2:00 p.m. to 3:00 p.m., Ingerson attended a manager's meeting. From 3:15 p.m. to 5:00 p.m., Ingerson addressed customers' residential and commercial needs.

— Ingerson had problems staying awake during meetings and training and getting to work at 8:00 a.m. Towards the end of his employment, Ingerson was not fulfilling his position expectations even with accommodations. In March 2015, his supervisor terminated his employment.

— Ingerson has suffered from narcolepsy for 25 years, and his main limitation and restriction is trouble staying awake as a result of poor sleep. He is currently not on medication for his condition and has no treatment plan. His condition has worsened over the past 25 years.

He also has problems with memory, focus, concentration, organization, time management, and fatigue.

— Ingerson can drive only short distances and cannot sit for more than one hour without falling asleep. Ingerson can perform daily activities approximately 50 percent of the time, but he takes multiple naps during the day and gave up many hobbies he can no longer perform.

— Ingerson is not sure what kind of work he could perform considering his current medical condition.

(*See id*. at 311–15).

### Neuropsychological Examination of Ingerson

In light of his complaints regarding his memory, focus, concentration, organization, and time management, as well as to see how he handled a day-long appointment, Principal exercised its right to have Ingerson examined by an independent neuropsychologist. (*See id*. at 273–87). In his October 31, 2016 report Dr. Robert Odgers ("Dr. Odgers") stated "[f]rom a cognitive perspective, the current data indicate that [Ingerson] could function without limitation in the workplace." (*See id*. at 12).

### Termination of Ingerson's Disability Benefits & His Appeal

On December 12, 2016, Principal notified Ingerson of its review of his claim and finding that Ingerson was no longer eligible for LTD benefits because he was capable of performing the majority of the substantial and material duties of his Own Occupation as defined under the policy. (*See* ECF 15-6 at 138–42). Specifically, Principal found Ingerson was capable of performing his job as a sales manager and working 40 hours a week with breaks, an extended lunch, and the option to work from home. (*See id*. at 141).

On May 16, 2017, Coppedge sent a letter to Principal demanding Principal reconsider its decision to discontinue Ingerson's LTD benefits. (*See id*. at 137). On July 11, 2017, Coppedge forwarded a letter from Dr. Ehle, who stated he was also seeing Ingerson for frequent nighttime

irregular heartbeat events caused by his extreme fatigue, and that Ingerson was suffering from myofascial pain due to lack of restful sleep. (*See id*. at 114–15). In early August 2017, Principal received updated medical records from Dr. Ehle and attempted to schedule an examination of Ingerson by a sleep specialist or occupational medicine specialist, but received no response from Coppedge. (*See* ECF 15-4 at 79–80; *see* 15-6 at 21–24). Later that month, Principal requested a panel review by specialists in internal medicine and sleep medicine. (*See* ECF 15-4 at 193, 200–05). Principal's referral asked the internal medicine specialist to speak with Dr. Ehle to determine if Ingerson could perform his occupation as a sales manager beyond December 9, 2016, or any occupation beyond June 12, 2017. (*See id*. at 202–03).

**Principal Obtained Peer Reviewers' Reports & Affirmed Denial of Ingerson's Disability Benefits**

Dr. Joseph Palermo ("Dr. Palermo"), who is board certified in internal medicine, issued his peer review report on August 30, 2017. (*See id*. at 156–62). The report states that, according to Dr. Ehle, narcolepsy-related fatigue was Ingerson's sole impairing diagnosis. (*See id*. at 158). Dr. Palermo concluded Ingerson could perform his Own Occupation of sales manager from December 10, 2016 through June 11, 2017 and beyond without restriction or limitation. (*See id*. at 160–61).

In his report dated September 1, 2017, Dr. Stephen Newman ("Dr. Newman"), who is board certified in pulmonary disease and sleep medicine, noted that Ingerson had not undergone sleep-testing since 1999, updated testing would be crucial to establish the correct diagnosis and treatment plan, the severity of Ingerson's narcolepsy from December 10, 2016 through June 11, 2017 was mild, Ingerson had not utilized numerous medications that might help ameliorate his condition, and Ingerson should see a sleep disorder specialist with experience in narcolepsy therapy. (*See id*. at 170–73). Dr. Newman concluded Ingerson could perform his Own Occupation of sales manager

from December 10, 2016 through June 11, 2017 and beyond without restriction or limitation. (*See id*. at 173).

On September 18, 2017, Principal affirmed its denial of Ingerson's claim finding he could perform his Own Occupation of sales manager from December 10, 2016 through June 11, 2017 and could perform any Gainful Occupation after June 12, 2017. (*See id*. at 88–91). On December 3, 2018, Ingerson filed this action against Principal to recover disability benefits under the policy pursuant to 29 U.S.C. § 1132(a)(1)(b) and attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). (*See* ECF 1, 7). Principal filed an answer and counterclaim denying liability and seeking attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). (*See* ECF 8).

## II.   RECOMMENDED CONCLUSIONS OF LAW

### A.  Standard of Review

The standard of judicial review afforded ERISA benefits determinations depends upon whether a plan administrator is vested with certain discretionary authority. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 251, 256 (5th Cir. 2018). "Where a plan administrator has discretion…the administrator's denial of benefits [is reviewed] deferentially for abuse of discretion." *Rittinger v. Healthy All. Life Ins. Co.*, 914 F.3d 952, 955 (5th Cir. 2019). In determining whether a benefit plan or policy grants an administrator discretionary authority, this District has stated:

> Discretionary authority cannot be implied; an administrator has no discretion to determine eligibility or to interpret the plan unless the plan language expressly confers such authority on the administrator. *See Cathey v. Dow Chemical Co. Medical Care Program*, 907 F.2d 554, 558–59 (5th Cir. 1990). Courts should not

> look for specific words or incantations; rather, courts should determine the breadth
> of the administrator's power from the plan language. *Wildbur v. ARCO Chem. Co.*,
> 974 F.2d 631, 637 (5th Cir. 1992). At a minimum, a plan construed as providing
> such discretion should convey that an administrator is entitled to construe, interpret,
> or otherwise exercise discretion in determinations of plan members' eligibility for
> benefits or in interpreting the plan. *McClure v. Vice President, Human Resources,
> Union Carbide Corp.*, Civ. A. H030054, 2005 WL 1214645, at *9 (S.D. Tex. May
> 20, 2005) (citing *Cathey*, 907 F.2d at 559).

*Collinsworth v. AIG Life Ins. Co.*, 404 F. Supp. 2d 911, 915 (N.D. Tex. 2005).

The parties dispute whether the policy gives Principal discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Ingerson argues the policy gives Principal such discretionary authority, but cites no policy language in support.[4] (*See* ECF 19 at 4). Principal argues that Texas law prohibits insurers from including such discretionary clauses,[5] and that in compliance with Texas law, Principal did not include such a discretionary clause in the policy. (*See* ECF 18 at 22). Having reviewed the policy (ECF 15-1), the undersigned finds the policy does not specifically confer discretionary authority on Principal. Thus, the undersigned reviews de novo Principal's denial of LTD benefits. *See Ariana M.*, 884 F.3d at 255.

"Under the de novo standard of review, the court's task 'is to determine whether the administrator made a correct decision.'" *Pike*, 368 F. Supp. 3d at 1030 (quoting *Niles v. Am. Airlines, Inc.*, 269 Fed. App'x 827, 832 (10th Cir. 2008)). When reviewed de novo, "the administrator's decision to deny benefits 'is not afforded deference or a presumption of correctness.'" *Koch v. Metro. Life Ins. Co.*, No. 7:18-CV-00154-O, 2019 WL 6329383, at *2 (N.D. Tex. Nov. 26, 2019) (quoting *Pike*, 368 F. Supp. 3d at 1030). "Rather, the court must

---

[4] The Court notes Ingerson's Reply Brief states Fifth Circuit case law on this issue is "somewhat contradictory." (*See* ECF 24 at 1). The brief further assumes the policy does not give Principal discretionary authority and that a de novo standard of review applies. (*See id.*).

[5] *See* Tex. Ins. Code § 1701.062.

'independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy.'" *Id.* (quoting *Pike*, 368 F. Supp. 3d at 1030). The plaintiff bears the burden of proving by a preponderance of the evidence that he is disabled under the policy. *Pike*, 368 F. Supp. 3d at 1031 (citing *Gilewski v. Provident Life & Accident Ins. Co.*, 683 F. App'x 399, 406 (6th Cir. 2017) ("[Plaintiff] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the policy.")). "[T]he burden of proof does not change because a plaintiff qualified at one point in time for disability benefits and the benefits were later terminated when [he or] she no longer qualified." *Id.* at 1030–31 (citing *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294–96 (9th Cir. 2010) ("the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant")).

### B. Benefits at Issue

The policy contains two definitions of disability: an "Own Occupation" definition and a "Gainful Occupation" definition. Under the "Own Occupation" standard, Ingerson is "disabled" if:

> [S]olely and directly because of sickness, injury, or pregnancy:
>
> During the Elimination Period and the Own Occupation Period, one of the following applies:
>
> > a. The Member cannot perform the majority of the Substantial and Material Duties of his or her Own Occupation.
> >
> > b. The Member is performing the duties of his or her Own Occupation on a Modified Basis or any occupation and is unable to earn more than 80% of his or her Indexed Predisability Earnings.[6]

---

[6] The policy states "[a] Member will be considered working on a Modified Basis if he or she is working to his or her full medical and vocational capacity on a part-time basis." (ECF 15-1 at 16). Ingerson does not contend that he was working on a part-time basis.

(ECF 15-1 at 12–13). The Own Occupation Period is two years. (*Id*. at 10).

 "Substantial and Material Duties" means:

> The essential tasks generally required by employers from those engaged in a particular occupation that cannot be modified or omitted. If a Member routinely works on average 40 hours or more per week, The Principal will consider the Member able to perform the Substantial and Material Duties of an occupation if he or she is working, or has the capacity to work, 40 hours per week.

(*See id*. at 22–23). "Own Occupation" means:

> The occupation the Member is routinely performing when Disability begins. The occupation of the Member as it is performed in the national economy when Disability begins. Own Occupation does not mean the specific tasks or job the Member is performing for the Policyholder or at a specific location.

(*Id*. at 19).

Once disability benefits have been payable for two years, Ingerson is considered disabled only if he meets the "Gainful Occupation" definition. Under this standard, Ingerson is disabled if:

> [S]olely and directly because of sickness, injury, or pregnancy:
>
> ***
> After completing the Elimination Period and the Own Occupation Period, one of the following applies:
>
>> a. The Member cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience.
>>
>> b. The Member is performing the Substantial and Material Duties of his or her Own Occupation or any occupation on a Modified Basis and is unable to earn more than 60% of his or her Indexed Predisability Earnings.

(*Id*. at 12–13).

Ingerson's "Incurred Date" and date he stopped working for Scottco is March 14, 2015.

(*See* ECF 15-4 at 1, 54). Because the policy provides for a 90–day Elimination Period (*see* ECF 15-10 at 10), Ingerson did not become eligible to receive LTD benefits until approximately June 13, 2015. (*See* ECF 15-8 at 39). Thus, the two-year Own Occupation period for Ingerson's claims

ran through June 12, 2017. (*See id.*). Ingerson received LTD benefits under the policy for a portion

of the Own Occupation period, from June 13, 2015 to December 9, 2016. (*See* ECF 15-6 at 138–

42; *see* 15-8 at 39–44). This dispute arises from Principal's termination of those benefits effective

December 10, 2016. (*See* ECF 15-6 at 138–42).

Because Principal denied Ingerson's claims during the Own Occupation period, it did not

decide whether Ingerson would be entitled to benefits under the more stringent Gainful Occupation

standard. Principal must first be afforded the opportunity to make this initial determination before

the Court can review such a claim. *See Bray v. Fort Dearborn Life Ins. Co.*, 312 F. App'x. 714,

716 (5th Cir. 2009) (holding that district court did not err in remanding plaintiff's claim for "any

occupation" disability benefits to plan administrator for initial determination, after finding the plan

administrator's decision under "own occupation" standard arbitrary and capricious); *see also

Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 605–06 (7th Cir. 2008) (holding that when an

ERISA plan administrator denies benefits under an "own occupation" standard, but makes no

determination under the "any occupation" standard, the matter must be sent back to the plan

administrator to address the issue in the first instance). Thus, the issue before the undersigned is

whether Ingerson is entitled to LTD benefits under the policy from December 10, 2016 to June 12,

2017, the portion of the Own Occupation period Ingerson was denied LTD benefits.

### C.  De Novo Review/Analysis

Because the undersigned reviews Principal's denial of LTD benefits de novo, no deference

is given to Principal's decision, and the undersigned evaluates the persuasiveness of each party's

case to determine if Ingerson adequately established he is disabled under the policy. *See Pike*, 368

F. Supp. 3d at 1030.

In support of his argument that he is disabled under the policy, Ingerson seems to primarily rely on his history of narcolepsy and documentation from both Scottco and Principal stating Ingerson was terminated because his health issues prevented him from performing his job as a sales manager. (*See* ECF 19). Principal argues the administrative record simply does not support Ingerson's claim that his narcolepsy prevents him from performing a majority of the substantial and material duties of a sales manager. (*See* ECF 18 at 23–27). For the reasons stated below, the undersigned finds Ingerson has not met his burden to show his narcolepsy prevented him from performing the majority of the substantial and material duties of a sales manager from December 10, 2016 to June 12, 2017.

**The Substantial and Material Duties of a Sales Manager**

To obtain LTD benefits from December 10, 2016 to June 12, 2017, Ingerson must show by a preponderance of the evidence that narcolepsy prevented him from performing the majority of the substantial and material duties of the occupation he routinely performed, sales manager, as it was performed in the national economy when his disability began. (*See* ECF 15-1 at 12–13, 19). Neither party offers much guidance or argument regarding what a sales manager's substantial and material duties are either in the national economy or at Scottco. This is especially troubling with respect to Ingerson because he has the burden to show he is disabled under the policy, which requires him to define the substantial and material duties of a sales manager and show he could not perform a majority of those duties due to narcolepsy. The requisite showing cannot be made without first identifying the substantial and material duties at issue.

The parties' briefing and the record suggests the parties rely on Ingerson's actual duties as a sales manager at Scottco, rather than the duties of a sales manager in the national economy as the policy requires. Dr. Sood's report refers to Ingerson's specific job duties and accommodations

while at Scottco. (*See* ECF 15-8 at 70–72). Dr. Odgers (*see* ECF 15-7 at 8), Dr. Palermo (*see* ECF 15-4 at 157), and Dr. Newman (*see id.* at 169) reviewed the investigator's report from the June 27, 2016 CoventBridge interview of Ingerson, which contained Ingerson's description of his duties as a sales manager at Scottco (*see* ECF 15-7 at 312). Dr. Odger's report stated he reviewed Ingerson's job description, though it is not clear to what description the report refers. (*See* ECF 15-7 at 8). Nothing in the reports suggest the duties of a sales manager in the national economy were reviewed. Additionally, Principal's May 28, 2015 denial letter (*see* ECF 15-10 at 14–17) and December 12, 2016 denial letter (*see* ECF 15-6 at 138–42) specifically mention Ingerson's work schedule and accommodations while at Scottco. In September 2017, Principal requested an occupational analysis of the sales manager position to determine whether the position is considered sedentary. (*See* ECF 15-4 at 84, 91). In what appears to be its request for analysis, Principal lists the following as the substantial and material duties of a sales manager:

  — Create annual sales incentive plan;

  — Research and evaluate products;

  — Quarterly marketing strategy;

  — Jobcost meeting reviews;

  — Employee coaching and training;

  — Job description development;

  — Performance reviews;

  — Process development and implementation;

  — Calculation of commission reports;

  — Various sales/goal reporting;

  — Frequent sitting, occasional walking/standing and driving (had assistance with driving);

  — Driving up to 3 hours per day but had someone else driving due to condition;

  — Trade show event organization;

  — Plant [sic] and track the preparation for all events in which employer had a booth;

— Attendance reporting;

— Manage meeting process;

— Wage structure;

— Employment separation; and

— Progressive discipline.

(*Id.* at 113–114; *see also id.* at 99–100).

Because the parties seem to rely on Ingerson's actual duties as a sales manager at Scottco, the undersigned focuses on these duties in its analysis. *See Burtch v. Hartford Life & Acc. Ins. Co.*, 314 F. App'x 750, 756 (5th Cir. 2009) (Even when a policy contains an "own occupation" standard, it is permissible to "[look] to the specific duties of [a plaintiff's] job as an example of the duties of such a position in the general economy.").

## Sleep Specialists' Opinions

Ingerson's claimed disability is narcolepsy, which he states is a sleep disorder and makes it difficult for him to stay awake. (*See* ECF 15-10 at 254). Thus, the undersigned finds the medical opinion of a doctor specializing in such a disorder instructive. The opinions of two sleep disorder specialists are present in the record. Ingerson offers two letters from a sleep disorder specialist, Dr. Polk, dated 2007 and 2008. (*See* ECF 15-9 at 160–61). Dr. Polk stated Ingerson last underwent sleep testing from which a diagnosis of narcolepsy could be made in approximately 1999. (*See id.* at 160). Given the age of the letters and the diagnostic testing, the undersigned does not find Dr. Polk's letters persuasive.

Principal offers the opinion of a board-certified sleep medicine specialist, Dr. Newman. (*See* ECF 15-4 at 168–81). Dr. Newman's review of the record included in part:

— Dr. Ehle's October 2, 2015 letter;

— Ingerson's supplemental information form dated February 4, 2016 detailing his subjective complaints;

19

— Dr. Ehle's June 10, 2017 letter;

— Dr. Polk's 2007 and 2008 letters;

— Saiz's December 4, 2015 explanation of Ingerson's termination;

— The investigator's report from the June 27, 2016 CoventBridge interview of Ingerson;

— Dr. Sood's February 6, 2014 report;

— Dr. Odger's October 2016 findings; and

— Dr. Ehle's notes regarding Ingerson from December 2016 to August 2017.

(*See id*. at 168–69). Dr. Newman concluded that Ingerson could perform his Own Occupation of sales manager from December 10, 2016 through June 11, 2017 on a full-time basis without restriction or limitation. (*See id*. at 171). The undersigned finds Dr. Newman's opinion compelling for the following reasons. First, Dr. Newman is a sleep specialist and his opinion is based on information relevant to the time period at issue. Second, the record shows Dr. Newman arrived at his conclusion after considering the interviewing investigator's findings, which included Ingerson's explanation of his duties as a sales manager (*see* ECF 15-7 at 312), and Saiz's December 4, 2015 explanation of Ingerson's termination and statement that Ingerson was not fulfilling his duties because of health issues (*see* ECF 15-9 at 132). Third, Dr. Newman cited the reasons for his conclusion, and the record supports his conclusion. Dr. Newman found that Ingerson's sleep disorder diagnosis is "excessive daytime somnolence" and that testing to establish a current diagnosis of narcolepsy was lacking because diagnostic testing has not been performed since 1999. (*See* ECF 15-4 at 170). He found the severity of the excessive daytime somnolence to be mild from December 10, 2016 through June 11, 2017. (*See id*.). This conclusion was based on the following findings (*see id*.), which are supported by the record:

20

— Dr. Ehle's notes from December 2016 to August 2017 do not mention excessive daytime somnolence. (*See* ECF 15-6 at 29–47).

— Ingerson was able to stay vigilant for a one-and-a-half-hour interview with Dr. Odgers and a two-hour interview with the CoventBridge investigator. (*See* ECF 15-7 at 5, 317).

— Ingerson had recently run for City Council. (*See* ECF 15-8 at 202, 232).

— The records reflect the absence of therapy for narcolepsy and for excessive daytime somnolence from December 2016 through August 2017. (*See* ECF 15-6 at 29–47).

Finally, in concluding that Ingerson could perform his Own Occupation of sales manager from December 10, 2016 through June 11, 2017 on a full-time basis without restriction or limitation, Dr. Newman stated:

> The claimant is driving an automobile, shows persistent wakefulness and cognitive performance during an [interview] in June 2016, and has a normal neuropsychological testing in October 2016, all in the absence of specific therapy for narcolepsy despite being "disabled" because of narcolepsy. Moreover, the notes of Dr. Ehle on June and August 2017 do not remark on excessive daytime somnolence.

(ECF 15-4 at 171).

### Dr. Ehle's Opinion

The undersigned recognizes Dr. Ehle as Ingerson's treating physician. Dr. Ehle first saw Ingerson in September 2014 and treated him through at least July 2017. (*See id*. at 156–67; *see* 15-6 at 29–47; *see* 15-10 at 252). There is no treating physician preference in the ERISA context. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, "while *Black & Decker* holds that no special deference is required, this does not mean that a district court, engaging in a de novo review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative." *See Pike*, 368 F. Supp. 3d at 1044.

Dr. Ehle's opinion seems to be that Ingerson could work as a sales manager with certain restrictions and limitations, including allowing Ingerson to nap, take extended lunches, work from

home, and arrive to work late. (*See* ECF 15-9 at 199). The undersigned acknowledges Dr. Ehle's unique ability to observe Ingerson and asses the credibility of his complaints as compared to the other doctors offering opinions in this case. However, Dr. Ehle is not a sleep specialist, and as Dr. Newman correctly noted, Dr. Ehle's notes from December 2016 to August 2017 (the entirety of the time period at issue) do not mention excessive daytime somnolence or sleepiness. (*See* ECF 15-6 at 29–47). Additionally, Dr. Ehle's opinion that Ingerson could work as a sales manager with certain restrictions and limitations seems to contradict Scottco's statements and Ingerson's claims that Ingerson's health issues prevented him from performing his job. The record shows Scottco provided many, if not all, of the accommodations Dr. Ehle mentions until Ingerson's last day. (*See* ECF 15-4 at 52; *see* 15-9 at 132). Dr. Ehle's October 2, 2015 letter stating he had not seen a "significant worsening of [Ingerson's] narcolepsy over the past year" (ECF 15-9 at 199) also does not support Ingerson's claim that his narcolepsy rose to the level of a disability under the policy during this same time period.

**Other Doctors' Opinions**

*Dr. Sood*

Dr. Sood specializes in pulmonary medicine and occupational medicine and issued a report on February 4, 2016 detailing his findings from his review of Ingerson's claim. (*See* ECF 15-8 at 70–76). Dr. Sood's report stated Ingerson could perform his own occupation from June 13, 2015 to February 4, 2016, working up to 40 hours per week, if Ingerson could: (1) work one day per week from home, (2) have a two-hour lunch each day, (3) arrive one hour late to work, and (4) have a 15-minute break for every four hours worked. (*See id*. at 74–75). As noted above, the record shows Scottco provided many, if not all, of these accommodations until Ingerson's last day. (*See* ECF 15-4 at 52; *see* 15-9 at 132). The undersigned does not find Dr. Sood's report as compelling

as other medical evidence because the report does not address the time period at issue and Dr. Sood is not a sleep specialist. However, to the extent Dr. Sood's report and opinions can be used to evaluate Ingerson's abilities during the relevant time period, they do not support Ingerson's claims.

*Dr. Odgers*

Dr. Odgers, a neuropsychologist, issued an 11-page report on October 31, 2016. (*See* ECF 15-7 at 5–15). The report details Dr. Odgers's one-and-a-half-hour interview of Ingerson and lists the medical records and other documents Dr. Odgers reviewed, including Dr. Ehle's office notes from September 2014 to September 2015, Dr. Sood's report, forms Ingerson filled out during the course of his claim detailing his subjective complaints, Saiz's letters stating Ingerson was terminated because he could not perform his job, the investigator's report from the June 27, 2016 CoventBridge interview, and a job description. (*See id.* at 5–8).

Dr. Odgers concluded that "[f]rom a cognitive perspective, the current data indicate that [Ingerson] could function without limitation in the workplace." (*See id.* at 12). The undersigned finds his report and opinions compelling. Dr. Odgers's evaluation required Ingerson to perform a variety of tests on October 26, 2016 from approximately 8:30 a.m. to 4:00 p.m. (*See id.* at 6). Dr. Odgers observed Ingerson worked "straight through" this time, "taking only a few brief bathroom breaks." (*See id.*). The undersigned finds this instructive when considering whether Ingerson was capable of performing the substantial and material duties of a sales manager, a sedentary job. (*See* ECF 15-4 at 91, 101). Though Dr. Odgers is not a sleep specialist, as a neuropsychologist, he was capable of identifying any functional limitation from a cognitive standpoint. The undersigned finds it significant that Dr. Odgers observed Ingerson "appeared more sleepy during the afternoon, but this did not appear to impact his test performance." (*See* ECF 15-7 at 12).

*Dr. Palermo*

Dr. Palermo, who is board certified in internal medicine, concluded in his August 30, 2017 report that Ingerson could perform his Own Occupation of sales manager from December 10, 2016 through June 11, 2017 without restriction or limitation. (*See* ECF 15-4 at 160–61). The undersigned does not find Dr. Palermo's report and opinions as compelling as those of Dr. Newman and Dr. Odgers. Unlike Dr. Newman, Dr. Palermo is not a sleep specialist, and unlike Dr. Odgers, Dr. Palermo did not observe Ingerson in a setting similar to that of Ingerson's job as a sales manager.

Additionally, it is somewhat unclear which of Ingerson's alleged conditions and symptoms Dr. Palermo considered in his report. It seems that Dr. Palermo focused on possible comorbid conditions, including lack of quality of sleep, nighttime palpitations and irregular heartbeats, back pain, myofascial pain, anxiety, and depression, rather than narcolepsy. (*See id*. at 156–62). Dr. Palermo noted a lack of exams, functional assessments, testing, and requested consultations with respect to potential comorbid conditions. (*See id*. at 159). The report states "[t]here are no documented impairments related to the co-morbid diagnoses, that require medically necessary restrictions or limitations" from December 10, 2016 to June 11, 2017. (*See id*. at 160). The undersigned does not find Dr. Palermo's report and opinions helpful in determining whether *narcolepsy* prevented Ingerson from performing the majority of the substantial and material duties of a sales manager.

## CoventBridge Interview & Ingerson's Self-Reported Symptoms, Restrictions, and Limitations

The undersigned does not find the CoventBridge interview useful or compelling from a medical standpoint, as there is no evidence the interviewing investigator is a medical professional.

However, the interview is useful in evaluating Ingerson's subjective complaints. For this reason, the undersigned considers the interview and Ingerson's subjective complaints together.

Like the court in *Pike*, the undersigned finds the plaintiff's subjective complaints must be addressed the same way all other evidence is addressed in a de novo review—the undersigned must independently weigh the evidence and evaluate the persuasiveness of each side's case, bearing in mind Ingerson's burden to show he is disabled under the policy. *See Pike*, 368 F. Supp. 3d at 1030–31, 1051. Ingerson's subjective complaints are not supported by the medical opinions of Dr. Ehle, Dr. Sood, Dr. Odgers, Dr. Palermo, or Dr. Newman. In addition to Dr. Ehle, Ingerson's treating physician who regularly heard and noted Ingerson's complaints at appointments, Dr. Sood, Dr. Odgers, Dr. Palermo, and Dr. Newman all considered Ingerson's subjective complaints:

— Dr. Sood (*see* ECF 15-8 at 71) ("Narcolepsy" section of clinical summary discusses Ingerson's self-reported symptoms);

— Dr. Odgers (*see* ECF 15-7 at 5–8) (one-and-a-half-hour interview of Ingerson included discussion of subjective complaints, as detailed in report, and review of medical records included Dr. Ehle's notes discussing Ingerson's self-reported symptoms and forms Ingerson filled out during the course of his claim detailing his subjective complaints);

— Dr. Palermo (*see* ECF 15-4 at 157) (review of medical records included investigator's report from the June 27, 2016 CoventBridge interview detailing Ingerson's subjective complaints); and

— Dr. Newman (*see id*. at 168–69) (review of medical records included Ingerson's supplemental information form dated February 4, 2016 detailing his subjective complaints, investigator's report from the June 27, 2016 CoventBridge interview detailing Ingerson's subjective complaints, and Dr. Odgers's report detailing Ingerson's subjective complaints).

No treating or reviewing doctor found Ingerson incapable of performing the majority of the substantial and material duties of a sales manager. Two of the five doctors—Dr. Ehle and Dr. Sood—found Ingerson could perform his job as a sales manager with certain restrictions and limitations. However, the record shows Scottco had largely, if not wholly, implemented the

restrictions and limitations during Ingerson's employment.[7] The undersigned is not persuaded Ingerson was incapable of performing the majority of the substantial and material duties of a sales manager.

Other evidence in the record further contradicts Ingerson's subjective complaints. By way of example, Ingerson was able to perform his job from February 2012 to March 2015 (*see* ECF 15-7 at 312) without a "significant worsening of [his] narcolepsy" from approximately October 2014 to October 2015 (*see* ECF 15-9 at 199). He also ran for City Council in the first half of 2015 (*see* ECF 15-8 at 202, 232) and continued to drive himself places, including to run errands and attend appointments, despite reporting falling asleep while driving once and requiring a driver for work travel (*see* ECF 15-4 at 46; *see* 15-7 at 5–7, 314).

## Conflict of Interest

Ingerson argues Principal's denial of benefits is improper considering the conflict of interest arising from Principal's duty to both evaluate claims for benefits and also pay benefits. (*See* ECF 19 at 4). Because the undersigned has engaged in a de novo review and come to the same conclusion as Principal with respect to LTD benefits from December 10, 2016 to June 12, 2017, this argument need not be addressed. *See Pike*, 368 F. Supp. 3d at 1085.

### D. Prejudgment Interest

Ingerson requests prejudgment interest. (*See* ECF 19 at 8). "While pre-judgment interest is available in ERISA cases, ERISA does not explicitly provide for prejudgment interest, and whether

---

[7] *See Ewing v. Metro. Life Ins. Co.*, 427 F. App'x 380, 382–83 (5th Cir. 2011) (applying abuse of discretion standard and upholding administrator's consideration of employer's accommodations when evaluating whether condition prevented plaintiff from performing duties of her job); *see Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 231 (5th Cir. 2004) (affirming administrator's conclusion that "so long as [beneficiary] was able to perform all the substantial and important aspects of her job, with reasonable accommodation, and any aspects of the job that she could not perform with reasonable accommodation were, singularly or together, not indispensable or essential to the job, then she was not disabled"). Though neither case involves a de novo review of an administrator's denial of benefits post-*Ariana M.*, the undersigned finds them instructive.

to grant such a remedy is thus within the discretion of the district court." *Pike*, 368 F. Supp. 3d at 1084 (citing *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016)). "[Prejudgment interest] is not awarded as a penalty, but as compensation for the use of funds." *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988). Because Ingerson's claims fail, the undersigned finds an award of prejudgment interest improper.

### E.  Attorney's Fees

Ingerson and Principal both request reasonable attorney's fees. (ECF 18 at 31; 19 at 8). The Federal Rules of Civil Procedure state that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Supreme Court has held that "a court 'in its discretion' may award fees and costs 'to either party,' as long as the fee claimant has achieved 'some degree of success on the merits.'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010) (citation omitted).[8] The court can award attorney's fees when "the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y].'" *Id.* at 255 (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 n.9 (1983)).

The undersigned finds Principal is entitled to attorney's fees because it has achieved success on the merits by virtue of the undersigned's recommendation of judgment in its favor.

---

[8] The Fifth Circuit established and previously applied a five-factor test for deciding whether to award attorney's fees under 29 U.S.C. § 1132(g)(1). *See Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). However, since the Supreme Court's decision in *Hardt*, the Fifth Circuit has held the *Bowen* test is no longer mandatory. *See LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 846–47 (5th Cir. 2013).

## RECOMMENDATION

For the above reasons, the undersigned recommends the District Judge enter judgment on the record in favor of Principal pursuant to Federal Rule of Civil Procedure 52, after considering evidence from Principal as to its attorney's fees.

In that regard, the undersigned further recommends that within 28 days from the date of any Order adopting this Findings, Conclusions, and Recommendation, Principal file a motion for attorney's fees for consideration by the District Judge in issuing judgment. The motion should be supported by evidence reflecting the reasonable amount of fees sought, and shall include argument as to the authority upon which such fees may be granted. Ingerson shall file a response, if any, in accordance with the Local Rules, and Principal may file a reply in accordance with the same.

## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these Findings, Conclusions, and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED May 13, 2020.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions, and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). *Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed* as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions, and Recommendation." Objecting parties shall file the written objections with the

United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).